1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8    JERRY GEORGE WOOD JR,

9                          Plaintiff,

10         v.

11    KEVIN YOUNG, et al.,

12                          Defendant.

CASE NO. C18-983-MJP-BAT

**REPORT AND
RECOMMENDATION**

13         In this 42 U.S.C. § 1983 civil rights action, plaintiff Jerry George Wood Jr., proceeding

14    pro se and *informa pauperis*, names as defendants Captain Kevin Young, Sergeant Daniel

15    Young, MHP (Mental Health Professional) Mirra Merkel, and MHP Jacob Taylor, all employees

16    of Snohomish County Corrections, as well as Snohomish County Deputy Prosecuting Attorney

17    Matthew Baldock (DPA Baldock).[1] Mr. Wood alleges that: (1) Defendants violated his

18    constitutional rights by placing him in solitary confinement, replacing his metal bed frame with a

19    plastic bed frame, and denying him access to a chair, table or desk in his cell; (2) The Jail's

20    phone system does not allow him to make any phone calls to his criminal defense attorney; (3)

21    Defendants will not provide him with paper and envelopes to communicate with his attorneys,

22    the Courts, or to submit complaints to the Washington Bar Association; and (6) Defendants have

23    _____

[1] Defendants Kimberly Parker and Daniel Stites were initially named in the amended complaint
but were dismissed pursuant to the Court order dated August 28, 2018. Dkt. 10.

REPORT AND RECOMMENDATION - 1

been deliberately indifferent to his mental health needs. Dkt. 8. He seeks an unspecified amount of monetary damages, and that he be given access to the courts/attorneys, be given "proper and adequate living means in [his] cell" and be "taken out of solitary confinement" have all MHP staff "take a refresher course" and all correction staff "take a human relations certified course." Dkt. 8, at 5. Defendants move for summary judgment. Dkt. 71. The Court recommends that the motion for summary judgment be granted.

## BACKGROUND

**A.    The Court Order Limiting Plaintiff's Access**

The record shows Mr. Wood was booked into the Snohomish County Jail on January 16, 2017, on charges of second degree rape for allegedly beating and raping a woman named K.M.. *See* Dkt. 75, K. Young Decl., ¶ 3; Dkt. 73, Baldock Decl.; Dkt. 73-2, Amended Information.

Defendants present evidence that on January 27, 2018, an inmate ("the inmate") housed in the same maximum security module as Mr. Wood was informed that someone had posted bail on his account and that he would be released. Dkt. 73, Baldock Decl., at 2-8; Dkt. 73-1 and Affidavit of Probable Cause; Dkt. 73-2 Amended Information. While being processed for release, the inmate requested to speak with a sergeant. *Id.* The inmate then handed the sergeant some pages that appeared to have been ripped from a book and explained they were pages were from books that Mr. Wood had given to him. *Id.* The inmate told the sergeant that the pages included a handwritten offer from Mr. Wood to pay him to kill a woman named "K___" as well as instructions to abduct two witnesses in the case of the rape of K.M. *Id.*

The inmate subsequently informed a Snohomish County Sheriff's deputy sent to investigate that Mr. Wood had told him he would arrange to pay his bail. *Id.* Shortly after that conversation, the inmate told the deputy that Mr. Wood arranged to have two books from the Jail

library transferred from his cell to the inmate. *Id.* The inmate indicated that sometime later, Mr. Wood asked him if he had read the books, referring to specific page numbers. *Id.* The inmate told the deputy that Mr. Wood followed through on his offer to post bail for him and when the inmate realized he was going to be released he tore the relevant pages from the books and hid them until he was able to contact the sergeant. *Id.* The inmate showed the deputy the pages from the books and pointed out places where Mr. Wood wrote notes in between the lines of printed text. *Id.* The deputy confirmed with jail staff that the two books from which the pages had been removed were recently transferred from Mr. Wood to the inmate. *Id.*

The defendants present further evidence that on January 29, 2018, the inmate, now out of custody, met with a detective and informed him that the notes Mr. Wood wrote in the first book contained an offer to bail him out and pay him money and a car to kidnap or kill a woman named "K___" and to kidnap a boyfriend and girlfriend whose names were specified. *Id.* The notes also included specific information about where these people lived, who they lived with, and how to accomplish the murder or kidnappings. *Id.* The inmate told the detective that Mr. Wood had told him on Friday, January 26, 2018, that he had made arrangements to bail him out of jail and the next day, and he learned that a woman he did not know contacted the bail bonds company to do so. *Id.* Earlier in the day before the inmate was processed for release, the inmate indicated Mr. Wood had contacted him and told him that what he had promised was real. *Id.* The inmate further indicated that Mr. Wood then had a second book transferred from his cell to the inmate's cell which contained additional notes with more information including a physical description of K___, a physical description of her house, an instruction to hold K___'s elderly disabled father hostage and force him to make K___ come home if she wasn't there, as well as mention of the

REPORT AND RECOMMENDATION - 3

fact that the inmate needed to make sure that K___ did not show up for court for Mr. Wood's upcoming court hearings, and the directive to "make her disappear by any means." *Id.*

Based on this information the detective contacted Snohomish County Deputy Prosecuting Attorney ("DPA") Matthew Baldock, the prosecuting attorney assigned to Mr. Wood's rape case, who confirmed that Mr. Wood's pending rape case involves a victim named K___ who matched the physical description Mr. Wood provided in the notes and who lives with her elderly, wheelchair-bound father at the address Mr. Wood provided. *Id.* DPA Baldock informed the detective that while some of the information regarding K___ was contained in the discovery in the pending rape case (which should have been redacted before it was provided to Mr. Wood), there were additional details that did not appear in those documents, including the physical description of her house. *Id.* It was determined that this would suggest that Mr. Wood was communicating with someone outside the jail who scouted the location and provided him that information. *Id.* DPA Baldock further confirmed that the boyfriend and girlfriend named in the note to the inmate were witnesses in Mr. Wood's rape case and that they lived at the address Mr. Wood provided in the note to the inmate. *Id.*

Defendants present evidence that on February 2, 2018, the detective obtained records from the bail bonds company who posted the inmate's bail, which showed that Mr. Wood's mother had paid to secure the inmate's release from jail. *Id.* The detective also listened to two recorded phone calls between Mr. Wood and his mother discussing having his mother post bail for the inmate. *Id.* Following the investigation, DPA Baldock filed an Amended Information and Affidavit of Probable Cause adding the charges of criminal solicitation of first degree murder and criminal solicitation of first degree kidnapping. *Id.* Mr. Wood denies that he attempted to

engage an inmate to solicit murder and kidnapping. Dkt. 89, Plaintiff's Response to Motion for Summary Judgment and Declaration, at 3.

In light of the fact that the additional charges arose out of evidence of Mr. Wood's use of jail resources to surreptitiously communicate with another inmate in the same module, and Mr. Wood's ability to communicate with those outside the jail to post that inmate's bail bond and to obtain information relating to the specific description of K____'s residence, the Snohomish County Superior Court entered an order on February 22, 2018, directing that Mr. Wood's "use of telephone, visitation privileges, use of library, and mail privileges are restricted to allow only contact with defense counsel and/or persons with their firm." Dkt. 73, Baldock Decl.; Dkt. 73-3, "Order on Release/Detention of Defendant" Dated Feb. 22, 2018.

**B.     Placement in Restrictive Housing**

Defendants present evidence that over the course of 2017, Mr. Wood committed numerous major rule violations including fighting and yelling at other inmates and that other inmates threatened to attack Mr. Wood over his charges. Dkt. 75, K. Young Decl. at 2. Keep separate orders were also entered between Mr. Wood and other inmates with whom he fought. *Id.* As a result, Mr. Wood was placed in the maximum security module several times over the course of 2017. *Id.* In late January 2018, in advance of the court's order limiting Mr. Wood's communication privileges, the detective assigned to investigate the case related to Mr. Wood's alleged solicitation to commit kidnapping and murder communicated the details of the forthcoming charges to Snohomish County Corrections Captain Kevin Young. *Id.* Because the alleged murder-for-hire plot arose out of Mr. Wood's ability to communicate with other inmates housed in the same module, Captain Young immediately ordered that Mr. Wood be transferred to restrictive housing, which is maximum security housing removed from proximity to other

1    maximum security inmates. *Id.* Mr. Wood was transferred to a cell in 5 North, a maximum

2    security module with a row of cells used to house inmates who need to be kept in restricted

3    access to other inmates. *Id.* The cells in that portion of 5 North are single occupancy cells with a

4    sink and toilet fixed to the wall and a large freestanding metal bed frame. *Id.*

5            Defendants submit evidence that on January 30, 2018, at approximately 2:50 p.m.,

6    Sergeant Daniel Young was working in the sergeant's office on the fifth floor of the Jail when he

7    heard Mr. Wood yelling at the deputy assigned to the 5 North module, Deputy Anderson. Dkt.

8    78, D. Young Decl., at 1-2. Sergeant Young indicates he heard Mr. Wood say, "You want to see

9    crazy, I'll show you some motherfucking crazy" and approximately two minutes later, he heard

10   two very loud thumps, which sounded as though someone was using a large metal object to ram

11   a door. *Id.* Sergeant Young indicates he walked down the hall to 5 North Medical Cell #01,

12   where Mr. Wood was housed. *Id.* Through the rectangular window of Mr. Wood's cell, Sergeant

13   Young indicates he observed Mr. Wood holding the large metal bed frame, which he proceeded

14   to ram into the cell door. *Id.* Sergeant Young states he was concerned that if Mr. Wood bashed

15   the door in the right place, he could break the lock. *Id.* Sergeant Young indicates that Mr. Wood

16   stated he was tired of "people messing with him for no reason" and that he then reached into his

17   toilet, grabbed some fecal matter, and threw it at the cell window. *Id.* Sergeant Young states he

18   attempted to speak to Mr. Wood in an effort to calm him down but Mr. Wood continued to yell

19   and slam the bed frame inside the cell. *Id.* Sergeant Young indicates he was increasingly

20   concerned that Mr. Wood would succeed in using the large metal bed frame to break the locking

21   mechanism of the door, allowing him to exit the cell and potentially threaten the safety of jail

22   staff. *Id.*

23

REPORT AND RECOMMENDATION - 6

1    Sergeant Young indicates he called Lieutenant Harrison to apprise him of what was going

2    on and the decision was made to transport Mr. Wood to Booking in a restraint chair and to place

3    him on a behavior watch. *Id.* Mr. Wood was placed in a restraint chair and escorted to a cell in

4    Booking. *Id.* Mr. Wood was subsequently removed from the restraint chair and was placed in a

5    different cell in 5 North, one that did not have a metal bed frame. Mr. Wood was instead

6    provided with a mattress in a plastic bed frame which sits on the floor, and is commonly referred

7    to as a "boat." *Id.* Sergeant Young and Captain Young both indicate that this action was taken

8    because of the safety and security concerns raised by Mr. Wood's actions with the bed frame.

9    *Id.*; Dkt. 75, K. Young Decl. Mr. Wood denies ramming the bed frame inside the cell and claims

10   that he merely kicked the door. Dkts. 8, 39.

11   On February 2, 2018, Mr. Wood was transferred to the Medical Housing Unit (MHU),

12   where he was again placed in restricted housing. Dkt. 75, K. Young Decl., ¶ 8. The cells in MHU

13   contain a toilet, sink, small ledge, and freestanding bedframe. *Id.* Captain Young indicates that

14   because Mr. Wood had so violently misused his metal bed frame, while in the 5 North module,

15   he was again provided with a boat. *Id.* Captain Young developed a housing plan for Mr. Wood

16   designed to keep both him, Jail staff, and outside citizens safe while complying with the

17   Snohomish County Superior Court's order limiting Mr. Wood's outside communication. *Id.* This

18   plan included housing Mr. Wood within MHU in a cell that had access to a shower that is not

19   used by other inmates. *Id.*, at ¶12. The housing plan also indicated that Mr. Wood would not be

20   allowed out of his cell with other inmates; that his time out of his cell would be on a rotating

21   schedule; that he would not be allowed social visits, per the criminal court's order; that attorney

22   visits would be scheduled on an as-needed basis; and that Mr. Wood would be allowed only

23

those commissary purchases listed on the commissary special request form used by inmates in

maximum security housing. *Id.*

Defendants present evidence that the Jail's Classification Committee (consisting of a

Snohomish County Corrections Bureau Captain, one or two Lieutenants or a Sergeant, a Mental

Health Professional (MHP), the jail nursing staff supervisor, the Classifications Supervisor, and a

jail counselor/classification specialist) meets on a weekly basis to review the classification status

of maximum security inmates. *Id.*, at ¶ 13. In March and April of 2018, the Classification

Committee met weekly, and monthly thereafter, to review Mr. Wood's classification status. *Id.*,

at ¶ 14. Each time, the Classification Committee concluded that Mr. Wood's housing in

maximum security in the Medical Housing Unit was appropriate for the safety and security of

staff, other inmates, and the community at large. *Id.* The Classification Committee continued to

review Mr. Wood's classification status on a monthly basis or whenever Mr. Wood made a

specific request that his status be reviewed. *Id.* Each time, the Committee concluded Mr. Wood's

housing was appropriate for institutional and community safety and security. *Id*

## C.    **Legal Envelopes**

Following the Superior Court's February 22, 2018, order limiting Mr. Wood's

communication privileges, Mr. Wood sent kites and grievances to the Jail's classification staff

requesting envelopes for correspondence to various attorneys, courts and the WSBA.

Jail Classification Supervisor Kimberly Parker spoke with Deputy Prosecuting Attorney

Matthew Baldock regarding whether Mr. Wood was permitted to have such envelopes under the

Superior Court's order. Dkt. 73, Baldock Decl., at 6. DPA Baldock indicates that he informed

Supervisor Parker that because the express terms of the order did not permit Mr. Wood to have

communication with anyone other than "defense counsel," Mr. Wood's communications were

limited to those with his attorneys of record, including those defending him in his pending

criminal case underlying his instant incarceration and his defense attorneys in any other pending

case. *Id.* In a subsequent conversation with Captain Daniel Stites regarding an envelope Mr.

Wood had addressed to Judge Robart of the Western District of Washington, DPA Baldock

indicated that while he did not have an objection to Mr. Wood writing to judicial officers, it was

not permitted under the language of the Superior Court's order. *Id.*

DPA Baldock communicated the substance of these conversations to Mr. Wood's

criminal defense counsel via email, and indicated that they might wish to bring a motion before

the Superior Court to modify the conditions of the order. *Id.*, Ex. D. DPA Baldock states that he

did not instruct anyone at the Jail to take a particular course of action regarding legal envelopes,

nor did he make any recommendations regarding the specific conditions of Mr. Wood's

confinement. *Id.*

Supervisor Parker also indicates that in her discussion with DPA Baldock, that he

indicated it was his position that "because the express terms of the [February 22, 2018] order did

not permit [Mr. Wood] to have communication with anyone other than 'his attorney,' [Mr.

Wood] was only permitted to have communications with his attorney of record, in the pending

criminal case underlying his incarceration in the Snohomish County Jail or with his defense

counsel of record in any other pending case." Dkt. 49, Parker Decl., at 2-3. Supervisor Parker

indicates when Mr. Wood requested envelopes to attorneys, Classification Specialists Charles

Mitchell and Alexis Wafstet, who Supervisor Parker supervises, were instructed to look up Mr.

Wood's attorneys of record on the Court's website and supplied Mr. Wood with envelopes for

those attorneys only. *Id.*  In response to his written kites and grievances, Supervisor Parker

indicated that Mr. Wood would not, pursuant to the court order, be supplied with the additional

1   envelopes he sought. *Id.* Supervisor Parker also indicates that she instructed the other Jail

2   Classification employees whom she supervises, including Classification Specialists Charles

3   Mitchell and Alexis Wafstet, to indicate the same to Mr. Wood in their responses to his kites. *Id.*

4   The record shows that new defense counsel, Walter O. Peale III, was substituted in Mr.

5   Wood's Snohomish County Superior Court criminal case on March 15, 2018. Dkt. 89, Plaintiff's

6   Response to Motion for Summary Judgment and Declaration, at 18-19; Dkt. 90, Defendants'

7   Motion for Summary Judgment, at 8-9. Mr. Wood requested envelopes for Mr. Peale via kite on

8   March 22, 2018, and March 30, 2018, and both requests were denied by Classification Specialist

9   Alex Wafstet on April 3, 2018. *Id.* The denials included explanations that pursuant to the court

10   order Mr. Wood was only allowed envelopes for Jennifer Bartlett, who was Mr. Wood's

11   previous defense counsel in his Snohomish County case. *Id.*

12   **D.    Telephone**

13   Mr. Wood alleges that from March 15, 2018 to July 31, 2018, the date his amended

14   complaint was filed, he was unable to make phone calls to his attorney. Dkt. 8, at 6. Defendants

15   submit evidence that the jail phone records indicate Mr. Wood did not make any telephone calls

16   at all from January 28, 2018 to July 29, 2018. Dkt. 75, K. Young Decl., ¶ 17. The record also

17   shows that classification Supervisor Kimberly Parker communicated with Mr. Wood's criminal

18   defense attorney regarding this Jail telephone account and that Mr. Wood's criminal defense

19   attorney indicated that he was having ongoing trouble setting up his account. *Id.*, Ex. H. Jail

20   visitation records indicate that Mr. Wood had regular "professional visits" during that time. *See*

21   *id.*, Ex. G. Defendants assert that these visits were with Mr. Wood's attorney. Dkt. 75, K. Young

22   Decl. Mr. Wood asserts the majority of these professional visits were with his private

23   investigator, not his defense attorney. Dkt. 89, at 22-27.

REPORT AND RECOMMENDATION - 10

**E.      Mental Health Complaints**

Three days after Mr. Wood was first booked on January 16, 2017, he sent a kite to the Jail's Mental Health Professionals reporting feelings of depression and requesting to speak with someone. Dkt. 76, Hoover Decl., at 2. MHP Brad Hoover spoke with Mr. Wood on January 22, 2017 and Mr. Wood reported that he was feeling depressed. *Id.* MHP Hoover noted that according to the module deputy, Mr. Wood's behavior in the module had been aggressive and disruptive. *Id.* MHP Hoover noted Mr. Wood was cooperative and did not present as hostile, delusional, or responsive to internal stimulation or hallucinations. *Id.* MHP Hoover suggested that Mr. Wood reflect on what was triggering his disruptive behavior in an effort to demonstrate more positive behavior. *Id.* Mr. Wood kited the MHPs a few days later about having trouble sleeping and MHP Hoover sent a reverse kite with a hand out on addressing sleep disturbance issues. *Id.*, at 2-3, Ex. B. On February 10, 2017, Mr. Wood sent a kite indicating he was getting "stressed out" with regards to feeling unfairly treated in the Jail. *Id.* MHP Hoover indicates he scanned this kite into Mr. Wood's file but since it did not specifically seek or indicate a need for mental health treatment, MHP Hoover did not take any additional action. *Id.*

In March 2017, Mr. Wood began sending multiple kites to Jail Classification, indicating he was "hearing voices" and "feeling paranoia." *Id.* These kites were referred to the Jail's Lead MHP, Jacob Taylor. Dkt. 79, Taylor Decl., at 2. On March 17, 2017, MHP Taylor spoke to Mr. Wood in the 4 North module, which is a module for maximum security inmates as well as inmates with mental health concerns. *Id.* MHP Taylor indicates that while Mr. Wood was initially calm when the interview began, he became increasingly agitated after MHP Taylor informed him that the Classification Committee decided that he would be remaining in 4 North instead of going to a general population module. *Id.* When Mr. Wood asked why he could not go

1    to general population, MHP Taylor told him that because of the kites he had sent to classification

2    indicating he was "hearing voices" and "feeling paranoia," the Classification Committee had

3    decided his current module was more appropriate. *Id.* MHP Taylor indicates that Mr. Wood's

4    responded that he was "none of those things!" and when MHP Taylor asked him why he had said

5    he was, Mr. Wood said, "I was just bored. I am of sound mind!"[2] *Id.*, at 3.

6        Mr. Wood then went six months without requesting to be seen by the Mental Health

7    Professionals and without any referrals to the MHPs from other Jail Staff. *Id.* Sometime in the

8    fall of 2017, Mr. Wood called out to MHP Merkel so that she would come see him. Dkt. 77,

9    Merkel Decl., at 2. MHP Merkel indicates that because she was evaluating another inmate at the

10   time and did not have time to meet with him, she did not engage with Mr. Wood. *Id.* Mr. Wood

11   indicates that he had complained to MHP Merkel about hearing voices and that she laughed at

12   him and told him he wasn't crazy. Dkt. 8, at 8. MHP Merkel denies laughing at Mr. Wood or

13   telling him he wasn't crazy or even speaking to Mr. Wood on this occasion. Dkt. 77, Merkel

14   Decl., at 2.

15       On October 18, 2017, a module deputy requested that an MHP evaluate Mr. Wood, as he

16   appeared emotionally volatile to corrections staff. Dkt. 74, Burns Decl., at 2. MHP Jason Burns

17   saw Mr. Wood in the 4 North module through the window of his cell. *Id.* Mr. Wood was wearing

18   the standard-issue uniform bottoms, a long underwear top, and a towel around his head. *Id.* Mr.

19   Wood approached the door to speak with MHP Burns and presented as alert and oriented, calm

20   and collected, able to make his needs known and to follow the conversation adequately. *Id.*

21   During the conversation, Mr. Wood indicated he was hearing voices and that "they're telling me

22

23   _____
     [2] Mr. Wood appears to generally deny this asserting "not true" next to a copy of MHP Taylor's
     chart note although it is unclear precisely which aspect of the chart note Mr. Wood is disputing.
     Dkt. 89, at 56.

to do things I don't want to do and I don't know what to do about all of it." *Id.* Mr. Wood

indicated that he had heard voices a few years ago as well but they stopped and that he had

sought treatment at Sound Mental Health. *Id.* Because Mr. Wood indicated he would not be able

to remain safe if he stayed in 4 North, MHP Burns contacted the corrections deputy to ask that a

Sergeant approve moving Mr. Wood to a safety cell on a 10 minute suicide watch. *Id.*, at 3. MHP

Burns requested Mr. Wood's records from Sound Mental Health. *Id.* MHP Burns saw Mr. Wood

the following day while Mr. Wood was on the suicide watch. *Id.*

MHP Burns noted:

> Inmate appeared to be experiencing some emotional distress as he
> retold snippets of stories about his family including but not limited
> to apparently finding his father dead in his house, his grandmother
> finding his uncle dead in their house, etc. It appeared to this writer
> that the inmate might be trying to provide enough information to
> trigger a referral to a psych medication provider, however due to
> his history of denying any mental health symptoms and refusing
> medications in the past this seems not necessary. It appears to this
> writer that the inmate is feigning symptoms for a [sic] unknown
> reason.

*Id.* Mr. Wood indicated he wanted to see his mom, and after being told that he could not have

visits while on a suicide watch, Mr. Wood thereafter agreed to a verbal safety contact and the ten

minute watch was discontinued. *Id.*

MHP Hoover saw Mr. Wood on October 22, 2017, after Mr. Wood requested to speak

with an MHP about hearing voices. Dkt. 76, Hoover Decl., at 3. Mr. Wood was alert, oriented,

and able to make his needs known. *Id.* Mr. Wood indicated he was currently suicidal but that he

had confidence in his ability to contract for safety by alerting SCJ staff as appropriate. *Id.*

However, MHP Hoover placed Mr. Wood on a suicide watch to ensure his safety. *Id.*

In October 2017, Mr. Wood contends he complained that he was hearing voices from his

sink and the MHP Burns responded to his complaint by telling him to buy earplugs. Dkt. 8, at 8.

REPORT AND RECOMMENDATION - 13

1    MHP Burns acknowledges receiving a kite from Mr. Wood in December 2017 indicating that "I

2    still [sic] having issues with voices and I think they are coming from the sink and I can't sleep."

3    Dkt. 74, Burns Decl., at 4. MHP Burns indicates that he was aware that inmates in the Jail have

4    attempted to use the plumbing to communicate with each other and while he was aware Mr.

5    Wood had complained of auditor hallucinations before, because of the way the kite was phrased

6    he believed he was complaining about actual voices from other inmates. *Id.* Accordingly, MHP

7    Burns responded to the kite by informing Mr. Wood that ear plugs were available on the

8    commissary cart. *Id.* MHP Burns indicates that if he had believed Mr. Wood was experiencing

9    actual auditory hallucinations, his response would have been different. *Id.*

10          MHP Burns saw Mr. Wood again on November 1, 2017, while he was on suicide watch.

11   Dkt. 74, Burns Decl., at 3. MHP Burns noted Mr. Wood was alert and oriented, calm and

12   collected, able to make his needs known and follow the conversation appropriately. *Id.* Because

13   Mr. Wood indicated he no longer had any suicidal ideation, MHP Burns discontinued the suicide

14   watch. *Id.* On October 23, 2017, the Snohomish County Superior Court ordered Mr. Wood to

15   undergo psychological testing and a competency evaluation. Dkt. 79, Taylor Decl., at 3. On

16   November 8, 2017, the state of Washington Department of Social and Health Services Behavior

17   Health Administration sent a copy of the Competency Evaluation Report evaluating Mr. Wood to

18   the Jail Mental Health Providers. *Id.*, Exh. B. The report writer reviewed and summarized all of

19   Mr. Wood's mental health records and contacts with Jail MHPs during his incarceration as well

20   as Mr. Wood's background. *Id.* Mr. Wood was also assessed with psychological testing. *Id.* The

21   report writer ultimately concluded, similarly to several of the MHPs, – that Mr. Wood's test

22   results were "highly suggestive" that he was feigning or exaggerating his reported psychiatric

23   symptoms. *Id.* Thus, the results of the testing were "highly suggestive of malingering." *Id.*

1    MHP Hoover saw Mr. Wood on January 17, 2018, and noted he was cooperative,

2    subdued and did not present as hostile, delusional or responsive to "IS" or hallucinations. Dkt.

3    76, Hoover Decl., at Exh. D. MHP Hoover noted Mr. Wood did present as mildly dysphoric and

4    dissociative and was silently mouthing words to himself. *Id.* MHP Hoover noted Mr. Wood

5    reported ongoing auditory hallucinations with onset before booking but Mr. Wood indicated that

6    he had no community based treatment and that he attributed his current housing to exacerbating

7    his symptoms. *Id.* MHP Hoover saw Mr. Wood again on January 24, 2018, and Mr. Wood

8    endorsed auditory hallucinations, but was also able to report directly regarding his current mental

9    health status, and MHP Hoover concluded that he was not a safety risk to himself. *Id.*, at 4.

10    On February 19, 2018, Sergeant Russell Jutte instructed medical personnel to

11    immediately respond to the Mental Health Unit, where Mr. Wood was housed, as Mr. Wood had

12    returned a razor with blood on it. Dkt. 79, Taylor Decl., at 4; Dkt. 76, Hoover Decl., Ex. E. Mr.

13    Wood was brought out of his cell in cuffs and the responding nurse noted several superficial

14    lacerations which had already begun the clotting process on Mr. Wood's forearms and wrists.

15    Dkt. 76, Hoover Decl., Ex. E. After dressings were applied Mr. Wood was placed on a suicide

16    watch. *Id.* When seen by MHP Hoover a few hours later, MHP Hoover indicates Mr. Wood

17    denied being suicidal and denied attempting to cut himself. *Id.* As a result, MHP Hoover

18    discontinued the watch status. *Id.* Mr. Wood alleges in his complaint that he had been hearing

19    voices again and "finally acted on them" in an attempt to commit suicide on this occasion. Dkt.

20    8, at 8.

21    Mr. Wood was also seen February 23, 2018, by MHP Taylor, who noted "there is no

22    evidence that this inmate is experiencing a loss of cognitive and volitional control, as he is able

23    to reasonably understand his surroundings, and able to rationally receive and interpret

1  information." Dkt. 79, Taylor Decl., at 4. MHP Burns saw Mr. Wood again a day later, on

2  February 24, 2018. Dkt. 79, Burns Decl., at 4. MHP Burns placed Mr. Wood on a suicide watch

3  when Mr. Wood indicated he could not keep himself safe. *Id.* MHP Merkel saw Mr. Wood the

4  next day, on February 25, 2018. *Id.* MHP Merkel discontinued his safety watch when Mr. Wood

5  indicated he had "decided to be suicidal" the day before and denied any further feelings of

6  harming himself. Dkt. 77, Merkel Decl., at 3.

7       Following Mr. Wood's incident of self-harm in February of 2018, he was placed on a

8  sharps restriction, meaning that he could not have access to razors with which to shave or any

9  other potentially sharp instrument, such as nail clippers. Dkt. 79, Taylor Decl., at 5; Dkt. 75, K.

10 Young Decl., at 5. Mr. Wood was placed on a sharps restriction to decrease any risk of self harm

11 behaviors, given his threats of self harms in the past and the previous incident of cutting while in

12 custody. *Id.*

13      Several members of Jail staff, meet on a weekly basis to discuss the conditions of

14 confinement of high risk inmates. *Id.* The imposition and necessity of any sharps restrictions is

15 one of the topics discussed at the High Risk Inmate meetings. *Id.* After the initial imposition of

16 Mr. Wood's sharps restriction, the High Risk Inmate Committee discussed whether the sharps

17 restriction was appropriate for him given the circumstances. *Id.* The High Risk Inmate

18 Committee concluded that it was appropriate for Mr. Wood to remain on a sharps restriction

19 based on the self-harm incident. Dkt. 79, Taylor Decl., at 5. MHP Taylor indicates that while

20 there were times over the next few months that the sharps restriction was lifted, any time Mr.

21 Wood exhibited self-harm behavior or behavior assaultive towards Jail staff, he was placed back

22 onto a sharps restriction. *Id.* MHP Taylor and Sergeant Young indicate the purpose of the

23 restriction was Mr. Wood's own safety as well as the safety and security of Jail Staff. *Id.*, at 6.

On March 9, 2018, MHP Taylor indicates that while he was speaking with another inmate in MHU, Mr. Wood began screaming at him, "Why the fuck aren't you talking with me Taylor?! All of you MHPs suck!" *Id.* MHP Taylor indicates that when he explained to Mr. Wood that he was speaking with another inmate, Mr. Wood then screamed, "You're a liar! You're a fucking liar!" *Id.* MHP Taylor indicates that because Mr. Wood was presenting as extremely hostile and aggressive, he determined it was clinically inappropriate to speak to Mr. Wood at that time and he entered a chart note regarding the incident. *Id.*

MHP Taylor met with Mr. Wood again on April 13, 2018. *Id.* Earlier that same day, Mr. Wood had been provided a razor with which to shave. *Id.* The High Risk Inmate Committee had lifted the sharps restriction at that point in time because they believed Mr. Wood could keep himself safe. However, on this day, Mr. Wood had broken the razor before returning it. *Id.* The Jail MHPs decided that Mr. Wood would be placed back on a sharps restriction to decrease any risk of potential self-harm behaviors, given his previous history of self-harm and voiced suicidal ideation. *Id.* MHP Taylor indicates that prior to engaging in a conversation with Mr. Wood, with both Sergeant Daniel Young and MHP Burns present, Mr. Wood had been yelling and banging on his cell door. *Id.*

Mr. Wood asked MHP Taylor why he was placed on a sharps restriction and could not have his hair pick. *Id.* MHP Taylor indicates he explained to Mr. Wood that given the incident that morning where he destroyed his razor, the MHPs had decided he should be placed on a sharps restriction for his safety. *Id.* MHP Taylor indicates Mr. Wood angrily stated, "That doesn't make any sense! I slit my wrists and made comments in the past. I was just trying to shave but the razor kept catching in my beard so I broke it up. If I wanted to kill myself, there

1    would have been plenty of other opportunities." *Id.* MHP Taylor indicates he again explained to

2    Mr. Wood why his safety warranted placing him on a sharps restriction. *Id.*

3          During this interaction, Mr. Wood asked MHP Taylor about "why there is not a

4    continued investigation regarding missed responses to grievances he had written which he

5    believes MHP Merkel destroyed." *Id.* MHP Taylor indicates he was aware that Mr. Wood had

6    made allegations about MHP Merkel destroying grievances he had handed directly to her. *Id.*

7    MHP Taylor indicates he knew from his training and experience at the Jail that grievances are

8    not usually given to MHP staff, but rather to Classification staff. *Id.* MHP Taylor states he

9    informed Mr. Wood that he had checked with Jail Classification Staff and there was no evidence

10   to substantiate his accusations that his grievances were destroyed. *Id.* MHP Taylor indicates he

11   encouraged Mr. Wood to re-write another grievance and told him that he would personally

12   review it and respond accordingly. *Id.* MHP Taylor indicates Mr. Wood's response was, "You're

13   full of shit." *Id.*

14         On May 11, 2018, MHP Taylor met with Mr. Wood in response to Mr. Wood's request

15   that his sharp restrictions be lifted in order to prepare for his observance of Ramadan. *Id.*, at 7.

16   Mr. Wood informed MHP Taylor that the Muslim sect of which he was a member mandated that

17   hair be shaved to the size of a grain of rice before prayer and thus Mr. Wood was in need of a

18   razor. *Id.* MHP Taylor directed Mr. Wood to apply to Jail Classification. *Id.* MHP Taylor noted

19   Mr. Wood "did not display any evidence of a thought disorder or paranoid reaction" and denied

20   any suicidal ideation. *Id.* On July 19, 2018, MHP Taylor indicated Mr. Wood should remain on a

21   sharp restriction for continued safety, with the exception that he could use a pencil or nail

22   clippers with custody or medical staff present during his recreation time. *Id.*, at 8. The nature and

23   extent of the sharps restrictions placed on Mr. Wood were reviewed on a weekly basis during the

members of the Jail's high risk inmate meeting committee. *Id.* On July 21, 2018, Captain Kevin Young indicates Mr. Wood assaulted a corrections deputy with a pencil, and was again placed on pencil restriction. Dkt. 75, K. Young Decl., at 8.

## LEGAL STANDARDS

**A.    Summary Judgment**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).  A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law.  *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial."  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  A plaintiff

must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson*, 477 U.S. at 248.  In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1121 (9th Cir. 1995).

## DISCUSSION

**A.    Access to Courts and Right to Counsel**

Mr. Wood contends in his amended complaint that his right of meaningful access to the courts was violated because: 1) he was denied access to legal envelopes to send to various attorneys, the courts, and WSBA; and 2) because he was unable to call his attorney for a period of time due to issues with the phone at the jail. Dkt. 8. Defendants move for summary judgment on the grounds that they are immune from liability because their actions with respect to Mr. Wood's legal mail were performed pursuant to a facially valid court order. Dkt. 71. Defendants further assert defendant DPA Baldock is also immune from liability based on prosecutorial immunity. *Id.* Defendants also move for summary judgment on the grounds that Mr. Woods fails to demonstrate any actual injury as required to support a claim that he was denied access to the Courts. *Id.*

**1.    Legal Mail**

Mr. Wood's amended complaint alleges he was unable to respond to a March 16, 2018, order from the U.S. District Court (C17-1835-JRL) because he was not allowed access to "legal envelopes" to send to the U.S. District Court of Seattle and Snohomish County Superior Court. Dkt. 8, at 7. He also alleges he was not allowed access to the Washington State Bar Association

1  with whom he had a grievance pending against a former attorney. *Id.* Mr. Wood indicates that

2  DPA Boldock told jail officials that he was not allowed any legal envelopes to the courts,

3  WSBA, U.S. District Court, or "my other attorney." *Id.*

### i. Immunity

4  The Ninth Circuit has explicitly held that "[p]rison officials […] who are charged with

5  executing facially valid court orders enjoy absolute immunity from § 1983 liability for conduct

6

7  prescribed by those orders." *Engebretson v. Mahoney*, 724 F.3d 1034, 1042 (9th Cir. 2013).

8  It is undisputed that on February 22, 2018, the Snohomish County Superior Court entered

9  an order stating that Mr. Wood's "use of telephone, visitation privileges, use of library, and mail

10  privileges are restricted to allow *only contact with defense counsel and/or persons with their*

11  *firm.*" Dkt. 73-3 "Order on Release/Detention of Defendant" Dated Feb. 22, 2018 (emphasis

12  added). Defendants submit evidence, including the amended information in Mr. Wood's criminal

13  case and the declaration of DPA Baldock, that this order was issued based on new charges

14  against Mr. Wood (in his pending criminal case for second degree rape) of criminal solicitation

15  of first degree murder and criminal solicitation of first degree kidnapping. Dkts. 73, Baldock

16  Decl., 73-2. The record shows these charges were based on allegations that Mr. Wood had

17  solicited another inmate in the same cell block to kill one person and abduct two witnesses in the

18  pending rape case against him and that he had arranged with individuals outside the jail to pay

19  that inmate's bail bond in order to facilitate this. *Id.* The record further shows that on December

20  27, 2018, the Snohomish County Superior Court issued an additional order specifying that Mr.

21  Wood's "use of telephone, visitation privileges, use of library, and mail privileges are restricted

22  to allow only contact *with any court and any attorney*." Dkt. 73-5 "Order on Release/Detention

23  of Defendant" Dated Dec. 27, 2018

1    In opposition to defendants' motion, Mr. Wood presents copies of an email exchange

2    between his defense attorney in the Snohomish County Superior Court case, Jennifer Bartlett,

3    and DPA Baldock. Dkt. 89, at 16-17. In her email dated February 28, 2018, Ms. Barlett indicates

4    that the jail is denying Mr. Wood legal envelopes to John Henry Brown and Pete Offenbecher

5    based on conversations with DPA Baldock that Mr. Wood was only permitted to contact her (his

6    attorney in the Snohomish County Superior Court case). *Id.* In the email Ms. Bartlett indicates

7    that Mr. Wood is also represented by John Henry Brown "on his promoting prostitution case in

8    King County" and Pete Offenbecher in a case related to "probation violations." *Id.* In his

9    response to the email, DPA Baldock states that "[a]fter you brought it to my attention that the jail

10   was interpreting the Court's order to prohibit contact with anyone except the two of you, I

11   contact the jail to explain that Mr. Wood has other pending matters in other jurisdictions and that

12   a reasonable interpretation of the Court's order would probably allow contact with his attorneys

13   on those cases as well … this might be something to address with the court as a motion to

14   modify the conditions to allow contact with his other attorneys." *Id.*

15   To the extent Mr. Wood argues that jail officials or DPA Baldock should be held liable

16   for denying him legal envelopes for the courts, WSBA, or attorneys other than his defense

17   counsel in his Snohomish County Superior Court case and/or persons with their firm, his

18   argument fails. The terms of the order entered in Mr. Wood's pending Snohomish County

19   criminal case clearly state that Mr. Wood may only have contact with his "defense counsel

20   and/or persons with their firm" and is signed "approved for entry" by Amalachi C. Okoro,

21   "attorney for defendant." Dkt. 73-3. No mention is made in the February 22, 2018 order of any

22   other attorneys. The plain reading of this order limits Mr. Wood to contact with his defense

23

REPORT AND RECOMMENDATION - 22

counsel and persons with their firm in his Snohomish County case.[3] This reading of the original

order is further reinforced by the clear distinction made in the subsequent December 27, 2018,

Snohomish County Superior Court order issued at Mr. Wood's defense counsel's request

specifying that Mr. Wood's "use of telephone, visitation privileges, use of library, and mail

privileges are restricted to allow only contact *with any court and any attorney*." Dkt. 73-5. Thus,

to the extent Mr. Wood seeks to impose liability on defendants for the denial of legal envelopes

to anyone other than his defense attorneys in his Snohomish County criminal case, defendants

are absolutely immune from § 1983 liability for engaging in conduct prescribed by the February

22, 2018 order. *See Engebretson*, 724 F.3d at 1042.

Mr. Wood also appears to argue in opposition to defendants' motion, that because DPA

Baldock was involved in drafting the February 22, 2018 order, and was in contact with jail

officials regarding implementation of the order, that he is liable for the alleged constitutional

violations with respect to his legal mail. Dkt. 89. However, in the first instance, whether or not

DPA Baldock was involved in drafting the order, the order was issued by the Court, not by DPA

Baldock. Secondly, prosecutors, are entitled to absolute immunity from liability for damages

under 42 U.S.C. § 1983 where the prosecutor "acts within his or her authority and in a quasi-

judicial capacity." *Ashelman v. Pope*, 793 F.2d 1072, 1076 (9th Cir. 1986) (citing *Imbler*, 424

U.S. at 430-31); *see also Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 674, 678

(9th Cir. 1984) ("If the prosecutor acts as an advocate 'in initiating a prosecution and in

presenting the State's case,' absolute immunity is warranted.") (quoting *Imbler*, 424 U.S. at 430-

---

[3] It appears that at some points between the issuance of the first and second court order, based on discussions with DPA Baldock, Jail staff may have also allowed Mr. Wood to correspond with his defense attorneys of record in his *other* pending criminal cases. However, this does not alter the fact that the clear terms of the February 22, 2018, order shield defendants from liability for denying Mr. Wood envelopes to anyone besides his defense attorney of record in his Snohomish County case.

REPORT AND RECOMMENDATION - 23

31). Prosecutorial immunity applies, furthermore, "even if it leaves 'the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty.'" *Ashelman*, 793 F.2d at 1075 (quoting *Campbell v. Maine*, 787 F.2d 776, 778 (1st Cir.1986)).The Court also notes that "Washington Courts [also] closely follow federal constructs as they relate to absolute immunity" and under Washington state law "prosecuting attorneys, as quasi-judicial actors, are absolutely immune from liability for acts done in the performance of their official duties even if they act maliciously or willfully." *Schmitt v. Langenour*, 162 Wash.App. 397, 407 (2011).

Mr. Wood argues in his complaint and in opposition to the instant motion that DPA Baldock directed the violation of his constitutional rights and should have known the restrictions in the February 22, 2018, order would violate his rights of access to courts and to counsel. Dkts. 8, 89. However, Mr. Wood has neither alleged nor shown that DPA Baldock obtained the order outside of his quasi-judicial capacity as a prosecutor (i.e., as an "advocate 'in initiating a prosecution and in presenting the State's case'"). *Ybarra*, 723 F.2d at 678 (quoting *Imbler*, 424 U.S. at 430-31). The Court also notes that the emails Mr. Wood presents between DPA Baldock and Mr. Wood's defense attorney indicate that, despite the plain language of the order, DPA Baldock encouraged the jail to interpret the order more favorably to Mr. Wood to allow him to send legal mail to other attorneys. Dkt. 89, at 16-17. The emails also indicate that DPA Baldock also suggested to Mr. Wood's defense attorneys that this "might be something to address with the court as a motion to modify the conditions to allow contact with his other attorneys." *Id.* As DPA Baldock's actions were performed in his role as a prosecutor, he is entitled to prosecutorial immunity and the claims against him should be dismissed.

**ii.   Failure to Show Actual Injury or Prejudice**

1    Mr. Wood also notes in opposition to defendants' motion that new defense counsel

2  Walter O. Peale III was substituted in his Snohomish County Superior Court case on March 15,

3  2018, but that when he requested envelopes for Mr. Peale via kite on March 22, 2018, and March

4  30, 2018, both requests were denied on April 3, 2018. Dkt. 89, at 18-19. The denials included

5  explanations that pursuant to the court order Mr. Wood was only allowed envelopes for Jennifer

6  Bartlett. *Id.* Defendants acknowledge that Mr. Wood was denied legal envelopes for Mr. Peale

7  on April 3, 2018, shortly after he was substituted as defense counsel. Dkt. 90, at 8-9. However,

8  defendants note that the individual who denied Mr. Wood the legal envelopes (Alex Wafstet) is a

9  non-party and argue that the denial of envelopes to Mr. Wood's very newly-substituted counsel

10  does not amount to a constitutional violation particularly given that subsequent requests for

11  envelopes to Mr. Peale were granted. *Id.* Defendants also argue that Mr. Wood fails to show

12  actual injury or prejudice resulted from these isolated denials. *Id.*

13    Inmates have a fundamental constitutional right of access to the courts and prison

14  officials may not actively interfere with a plaintiff's right to litigate. *Lewis v. Casey*, 518 U.S.

15  343, 346 (1996); *Phillips v. Hust*, 588 F.3d 652, 655 (9th Cir. 2009). Courts have traditionally

16  differentiated between two types of access claims, those involving the right to affirmative

17  assistance, and those involving inmate's right to litigate without active interference. *Silva v.*

18  *DiVittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011). The right to assistance is limited to direct

19  criminal appeals, habeas petitions, and civil rights actions. *Lewis*, 518 U.S. at 354. Prisoners also

20  have the right to pursue claims, without active interference, that have a reasonable basis in law or

21  fact. *Silva*, 658 F.3d at 1103–04. This right forbids state actors from erecting barriers that impede

22  the right of access to the courts of incarcerated persons. *Silva*, 658 F.3d at 1102 (internal

23  quotations omitted).

1      To establish a violation of the right of access to courts, an inmate must show actual

2  injury. *Lewis*, 518 U.S. at 348. An "actual injury" is "actual prejudice with respect to

3  contemplated or existing litigation, such as the inability to meet a filing deadline or to present a

4  claim." *Lewis*, 518 U.S. at 348. Moreover, a prison regulation impinging on inmates'

5  constitutional rights, even a right of access to the courts, is valid if it is reasonably related to

6  legitimate penological interests. *See Lewis*, 518 U.S. at 353 (citing *Turner v. Safley*, 482 U.S. 78

7  (1987)).

8      The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

9  enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see*

10  *also Gideon v. Wainwright*, 372 U.S. 335, 342–43, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding

11  that Sixth Amendment right to counsel extends to state court proceedings through the Fourteenth

12  Amendment). The right to counsel "is a fundamental component of our criminal justice system,"

13  and "[l]awyers in criminal cases are necessities, not luxuries." *United States v. *910 Cronic,* 466

14  U.S. 648, 653, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (internal quotation marks omitted). "When

15  the government deliberately interferes with the confidential relationship between a criminal

16  defendant and defense counsel, that interference violates the Sixth Amendment right to counsel if

17  it substantially prejudices the criminal defendant." *Williams v. Woodford,* 384 F.3d 567, 584–85

18  (9th Cir. 2004); *see United States v. Irwin*, 612 F.2d 1182, 1186–87 (9th Cir.1980). *Nordstrom v.*

19  *Ryan*, 762 F.3d 903, 909–10 (9th Cir. 2014).

20      Defendants are entitled to summary judgment on these claims. First, as defendants point

21  out, the individual who denied Mr. Wood the legal envelopes to Mr. Peale (Alex Weifstat) is not

22  named as a defendant in this action nor does Mr. Wood demonstrate how any of the remaining

23  defendants (Daniel Young, Kevin Young, Mirra Merkel or Jacob Taylor) are responsible for this

1    alleged violation. Second, Mr. Wood fails to present facts or evidence to indicate he was actually

2    injured or substantially prejudiced by the denial of legal envelopes for Mr. Peale on April 3,

3    2018, as required to establish a claim for denial of access to the courts or violation of the right to

4    counsel.

5            The Court further notes that even if Mr. Wood could link a named defendant (or name a

6    proper defendant) and could allege actual injury or prejudice his claims would be subject to

7    dismissal without prejudice pursuant to *Younger v. Harris*, 401 U.S. 37, 45, 46 (1971). A Federal

8    Court will not intervene in a pending criminal proceeding absent extraordinary circumstances

9    where the danger of irreparable harm is both great and immediate. *See Younger*, 401 U.S. at 45.

10   The *Younger* abstention doctrine requires that a district court dismiss a federal action if state

11   proceedings are (1) ongoing, (2) implicate important state interests, and (3) afford the plaintiff an

12   adequate opportunity to raise the federal issue. *Columbia Basin Apartment Ass'n v. City of*

13   *Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) (citation omitted). All of the *Younger* criteria are

14   satisfied here. Mr. Wood's proceedings are ongoing, involve a criminal prosecution that

15   implicates important state interests, and there is nothing to indicate that Mr. Wood cannot raise

16   in his criminal case the same claims he raises here or that there is a danger of great and

17   immediate irreparable harm. Therefore, as these claims would unduly interfere with the state

18   criminal proceeding in a way in which *Younger* disapproves, they would be subject to dismissal

19   on this basis.

20           Accordingly, these claims should be dismissed.[4]

21

22   _____

     [4] Mr. Wood's complaint also alleges very generally that he is being denied access to a pencil by
     MHP Taylor in order to deny him access to the Court. Dkt. 8, at 9. However, the record shows
23   Mr. Wood was placed on sharps restriction after the February 2018 incident of self-harm. Dkt.
     79, Taylor Decl., at 7. The record shows that at certain points an exception was made that he
     could us a pencil or nail clippers with custody or medical staff present during recreation time and

1

2.      **Phone Calls to Defense Counsel**

2

Mr. Wood also contends defendants violated his right to counsel and right to access the

3

courts because he was unable to make phone calls to his defense attorney from February or

4

March 2018 to July 2018. Dkt. 8; Dkt. 39, at 20-23. Defendants present evidence that the phone

5

records from the jail indicate Mr. Wood made no calls from January 28, 2018, to July 29, 2019,

6

but that he had numerous professional visits during that time. Although Mr. Wood indicates

7

many of those professional visits were with his private investigator, not defense counsel, he does

8

not deny that he did have in-person visits with defense counsel during this period. Defendants

9

also present evidence that Mr. Wood filed a grievance in June 2018 alleging he was unable to use

10

the phone to contact his attorney and that the Classification Supervisor's response to that

11

grievance states "[it was] verified with [Jail] Technology that your phone is activated for

12

attorney calls. Your attorney of record needs to set up an account with the vendor. I spoke with

13

your attorney (Walter Peale) today and he is trying to resolve the issue with the vendor. He also

14

stated he would schedule a professional visit this week to speak with you." Dkt. 75, Decl. of K.

15

Young, at Exh. H.

16

_____

17

at some points Mr. Wood was also on pencil restriction where he was permitted to dictate kites

and grievances to corrections staff, but was not permitted access to a pencil himself. Id., Dkt. 75,

18

K. Young Decl., at 7-8. The record indicates the sharps restriction was occasionally lifted for

brief periods between February 2018 and the filing of the complaint July 20, 2018, but the

19

restriction was reinstated when any concern was raised regarding Mr. Wood's potential to self-

harm or harm others. *Id.* For instance, the sharps restriction was reinstated on one occasion when

20

Mr. Wood was given a razor with which to shave and returned it broken. *Id.* Plaintiff fails to

identify when he was allegedly denied access to a pencil by MHP Taylor or what his sharps or

21

pencil restriction status was at that point. Nor does plaintiff allege actual injury or prejudice as a

result of the alleged denial of access to a pencil. In sum, to the extent plaintiff intends to raise

22

this as a separate claim in his complaint, he fails to offer any specific facts sufficient to raise a

question of fact as to whether MHP Taylor violated his right of meaningful access to the courts.

23

Accordingly, to the extent plaintiff intended to raise this as a separate claim, this claim should

also be dismissed.

REPORT AND RECOMMENDATION - 28

1    Mr. Wood acknowledges there was an issue with his attorney's account but alleges it was

2    fixed "the following week" in March 2018. Dkt. 39, at 20-23. However, Mr. Wood offers no

3    facts to support his assertion that his attorney's account was fixed "the following week." Nor,

4    aside from generalized, conclusory assertions, does Mr. Wood demonstrate, that he was

5    substantially prejudiced by his inability to speak to his attorney on the phone during this period.

6    *See* Dkt. 8, Dkt. 39, at 20-23. In fact, Mr. Wood himself mentions several occasions on which

7    Jail staff placed a call to defense counsel on his behalf and left a message requesting that his

8    attorney come to visit him. *Id.*

9    However, because it appears Mr. Wood could, potentially, raise this as an issue in his

10    ongoing state criminal court proceedings, the Court recommends Mr. Wood's claims be

11    dismissed without prejudice pursuant to *Younger* (401 U.S. at 45). Here, state proceedings are

12    ongoing, involve a criminal prosecution that implicates important state interests, and there is

13    nothing to indicate that Mr. Wood cannot raise in his criminal case the same claims he raises

14    here. Furthermore, Mr. Wood does not appear to allege this issue is ongoing and, as such, there is

15    no danger of great and immediate irreparable harm. Therefore, as these claims could unduly

16    interfere with the state criminal proceeding in a way in which *Younger* disapproves, they should

17    be dismissed without prejudice on this basis.

18    **B.    Conditions of Confinement**

19    Mr. Wood claims his placement in solitary confinement violated his constitutional rights.

20    Mr. Wood also alleges defendants violated his constitutional rights by removing his metal bed

21    frame, giving him a plastic bed frame, and denying him a chair, desk or table for several months.

22    Dkts. 8, 39, 89.

23

REPORT AND RECOMMENDATION - 29

1    As a pretrial detainee, Mr. Wood has the right to be free from punishment under the

2    Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 533 (1979). The test for identifying

3    unconstitutional punishment at the pretrial stage of a criminal proceeding requires a court to

4    examine "whether there was an express intent to punish, or 'whether an alternative purpose to

5    which [the restriction] may rationally be connected is assignable for it, and whether it appears

6    excessive in relation to the alternative purposes assigned [to it].' " *Demery v. Arpaio*, 378 F.3d

7    1020, 1028 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 538). "Absent a showing of an expressed

8    intent to punish on the part of detention facility officials, that determination generally will turn

9    on 'whether an alternative purpose to which [the restriction] may rationally be connected is

10   assignable for it, and whether it appears excessive in relation to the alternative purpose assigned

11   [to it].'" *Id.* (citations omitted). "For a particular governmental action to constitute punishment,

12   (1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of

13   the governmental action must be to punish the detainee." *Demery*, 378 F.3d at 1029. Further, "to

14   constitute punishment, the harm or disability caused by the government's action must either

15   significantly exceed, or be independent of, the inherent discomforts of confinement." *Id.*, at

16   1030.

17   The Court evaluates a pretrial detainee's Fourteenth Amendment claim under an

18   objective deliberate indifference standard. *See Gordon v. County of Orange*, 888 F.3d 1118,

19   1124-25 (9th Cir. 2018) (applying objective standard to medical care claims and describing

20   similar treatment afforded medical care and other conditions of confinement claims) (citing

21   *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S. Ct. 2466, 2475, 192 L. Ed. 2d 416 (2015), and

22   *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016), *cert. denied*, 137 S. Ct.

23

831, 97 L. Ed. 2d 69 (2017)).[5] A pretrial detainee must demonstrate a defendant's acts or

omissions were objectively unreasonable, and identify objective facts indicating the "challenged

governmental action is not rationally related to a legitimate governmental objective or that it is

excessive in relation to that [objective]." *Kingsley*, 135 S. Ct. at 2473-74. This determination is

to be made keeping in mind that "[s]uch considerations are peculiarly within the province and

professional expertise of corrections officials, and, in the absence of substantial evidence in the

record to indicate that the officials have exaggerated their response to these considerations,

courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 547-48

(internal quotations and citations omitted).

The Supreme Court has recognized that "maintaining institutional security and preserving

internal order and discipline are essential goals that may require limitation or retraction of the

retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S.

at 546. The Supreme Court has further recognized that prison administrators "should be

accorded wide-ranging deference in the adoption and execution of policies and practices that in

their judgment are needed to preserve internal order and discipline and to maintain institutional

security." *Bell*, 441 U.S. at 547.

An institution must provide prisoners and pretrial detainees "adequate food, clothing,

shelter, sanitation, medical care, and personal safety." *Hoptowit*, 682 F.2d 1237, 1246 (9th Cir.

---

[5] Previously, "all conditions of confinement claims, including claims for inadequate medical care, were analyzed under a subjective deliberate indifference standard whether brought by a convicted prisoner under the Eighth Amendment or pretrial detainee under the Fourteenth Amendment." *Gordon*, 888 F.3d at 1122-23 (citing *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242-43 (9th Cir. 2010)). Although the Ninth Circuit has not expressly extended the objective deliberate indifference standard to all pretrial detainee conditions of confinement claims beyond a denial of medical care, failure-to-protect, and to excessive force claims, the decision in *Gordon* strongly suggests it will do so. *See Gordon*, 888 F.3d at 1120, 1124, and 1124 n.2 (citing *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (extending objective deliberate indifference standard to all pretrial detainee conditions of confinement claims)).

1982); *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996), *overruled on other*

*grounds in Marley v. United States*, 548 F.3d 1286 (9th Cir. 2008). However, the Constitution

"does not mandate comfortable prisons[.]" *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

Conditions of confinement "may be, and often are, restrictive and harsh[.]" *Morgan v.*

*Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Rhodes*, 452 U.S. at 347). "[N]ot every

disability imposed during pretrial detention constitutes 'punishment' in the constitutional sense."

*See Bell*, 441 U.S. at 537.

The Court considers conditions challenged by an inmate separately. *See Wilson v. Seiter*,

501 U.S. 294, 304-05 (1991); *Hoptowit*, 682 F.2d at 1246-47. As stated by the United States

Supreme Court in relation to Eighth Amendment claims:

> Some conditions of confinement may establish an Eighth
> Amendment violation "in combination" when each would not do
> so alone, but only when they have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food, warmth, or exercise—for example, a low cell temperature
> at night combined with a failure to issue blankets.

*Wilson*, 501 U.S. at 305. In other words, "[n]othing so amorphous as 'overall conditions' can rise

to the level of cruel and unusual punishment when no specific deprivation of a single human

need exists." *Id.*

### 1.      Placement in Restrictive Housing

Mr. Wood's placement in restrictive housing does not amount to punishment in violation

of the Fourteenth Amendment. The record here shows that Mr. Wood was placed in restrictive

housing in order to prevent him from having contact with other inmates in light of the new

allegations in his criminal case that he had attempted to solicit another inmate to kidnap and

murder witnesses against him in his pending criminal case. Defendants also present evidence that

Mr. Wood's placement in restrictive housing was necessary in order to comply with the Court

1    orders limiting his communication to only, initially, defense counsel in his Snohomish County

2    Criminal Court case and, subsequently, contact with only any court or any attorney.

3           Mr. Wood asserts in his amended complaint that his placement amounts to punishment

4    but, beyond this conclusory assertion, presents no evidence to raise a genuine issue of material

5    fact as to whether his placement in restrictive housing constituted "punishment" in violation of

6    the Fourteenth Amendment. Mr. Wood fails to present any facts or evidence to indicate

7    defendants' acts or omissions were objectively unreasonable, nor does he identify objective facts

8    indicating his placement in restrictive housing lacked a rational relationship to the legitimate

9    governmental objective of safety and security, or was excessive in relation to that objective.

10   *Kingsley*, 135 S. Ct. at 2473-74.

11          The court will not substitute its judgment for that of the detention facility with respect to

12   measures clearly taken to maintain order and security. The evidence shows Mr. Wood's

13   placement in restrictive housing was not imposed by defendants with an intent to punish but,

14   rather, to achieve order and security within the facility as well as to protect members of the

15   public. As such, the court finds that Mr. Wood's placement in restrictive housing did not violate

16   the Fourteenth Amendment and defendants are entitled to summary judgment with respect to this

17   claim. *See, e.g., Orth v. Balaam*, 528 Fed.Appx. 723, 726 (9th Cir. 2013) (upholding summary

18   judgment for defendants where record showed pretrial detainee's placement in behavioral

19   review, a form of administrative segregation, was reasonably related to the detention facility's

20   legitimate objective of maintaining safety and security and it therefore did not amount to

21   punishment); *Bell*, 441 U.S. at 546 ("[M]aintaining institutional security and preserving internal

22   order and discipline are essential goals that may require limitation or retraction of the retained

23   constitutional rights of both convicted prisoners and pretrial detainees.").

REPORT AND RECOMMENDATION - 33

1

2.      **Lack of Chair, Table and Desk**

2      Mr. Wood also argues defendants violated his constitutional rights by depriving him of a

3  chair, desk, or table in his cell for six months. However, defendants present evidence, which Mr.

4  Wood does not contradict, that the cells in the two locations Mr. Wood was housed – in a

5  particular part of the 5 North module and MHU – did not normally contain a chair, desk, or table.

6  *See*, Dkt. 75, K. Young Decl., at 4 (Stating that the cells in the portion of the 5 North module

7  where Mr. Wood was housed are single occupancy cells with a sink and toilet fixed to the wall

8  and a large freestanding metal bed frame while the cells in MHU contain a toilet, sink, small

9  ledge, and freestanding bedframe). *Id.* As discussed above, defendants have established Mr.

10  Wood's placement in these units was reasonably related to legitimate governmental interests and

11  was not excessive in relation to those interests. As such, Mr. Wood fails to raise a genuine issue

12  of material fact as to whether his lack of a chair, desk, or table "significantly exceed[ed] or [was]

13  independent of the inherent discomforts of confinement" or whether he was deprived of such

14  items for punitive reasons. The evidence shows this was the norm for cells in those parts of the

15  units in which Mr. Wood was housed and that his placement in those cells was related to a

16  legitimate governmental interest. *See Bell*, 441 U.S. at 537 (while the Due Process Clause

17  protects pretrial detainees from punishment, "not every disability imposed during pretrial

18  detention constitutes 'punishment' in the constitutional sense."). The Court also notes that

19  because it was the norm, the absence of a chair, desk, or table likewise does not imply punitive

20  intent on the part of the defendants or other jail staff.

21      3.      **Bed Frame**

22      Defendants present evidence that defendant Sergeant Daniel Young observed Mr. Wood

23  slamming his bed frame against the door and that Deputy Anderson heard Mr. Wood slamming

his bed frame against the door. Mr. Wood denies slamming his bed frame against the door and instead claims that the sounds jail staff heard coming from his cell was him kicking the door.

The replacement of Mr. Wood's metal bed frame with a plastic bed frame does not amount to punishment in violation of the Fourteenth Amendment. First, Mr. Wood does not deny that he was given a bed frame and mattress to sleep on. *Cf. Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989), (*overruled on other grounds by Bull v. City & Cty of San Francisco*, 595 F.3d 964 (9th Cir. 2010)) (finding pretrial detainee's uncontroverted allegation he was provided with neither a bed nor even a  mattress constitutes a cognizable Fourteenth Amendment claim.). Rather, Mr. Wood complains that the plastic bed frame he was given was uncomfortable and caused him back pain. Dkts. 8, 89. The fact that Mr. Wood found the plastic bed frame less comfortable than the metal bed frame does not amount to a condition that "significantly exceeds or is independent of the inherent discomforts of confinement[.]" *See, e.g., Thomas v. County of Los Angeles*, 703 Fed.Appx. 508, 511-12 (2017) (holding it was not clearly established for purposes of qualified immunity analysis that inmates sleeping on a mattress on the floor rose to the level of a constitutional violation).

Second, the record shows the substitution of the plastic bed frame was reasonably related to a legitimate governmental objective and was not excessive in relation to the legitimate governmental objective. The Court notes that Mr. Wood does not argue that if he had been slamming his bed frame against the door that it would have been unconstitutional for defendants to remove the metal bed frame and replace it with a plastic bed frame. Furthermore, this is not an instance where Mr. Wood denies doing anything and that his bed frame was arbitrarily removed from his cell. Rather, Mr. Wood acknowledges that jail staff heard something slamming against the door but alleges he was kicking the door, not slamming his bed frame against the door. Dkts.

8, 39, 89. Thus, even assuming jail staff were operating under the mistaken belief that Mr. Wood was ramming the bed frame against the door, their actions in removing the metal bed frame and replacing it with a plastic bed frame do not amount to punishment in violation of the Fourteenth Amendment.

Even if defendants were mistaken that Mr. Wood was ramming his bed frame against the door, the record shows their actions were not punitive but were reasonably related to a legitimate governmental objective of maintaining safety, order and security. Moreover, the Court notes that defendants did not leave Mr. Wood without a bed frame entirely but provided him with a plastic bed frame, allowing his mattress to be raised off the floor, while accomplishing the legitimate governmental objective of preventing Mr. Wood from using the bed frame as a weapon or threat to institutional safety. As such, the Court finds the record shows defendants' actions were not excessive in relation to a legitimate governmental objective.

Accordingly, these claims should also be dismissed.

## C.    Inadequate Medical Care

Mr. Wood's amended complaint alleges that since February 2017, he has been asking for help with respect to "hearing, seeing and being told to do things in his head." Dkt. 8, at 8. Mr. Wood contends generally that jail staff have ignored him and "made fun of him." *Id.* He contends that in September 2017, he complained to MHP Merkel that he was hearing voices and that she laughed at him and told him he wasn't crazy. *Id.* Mr. Wood contends this caused him more anxiety. *Id.* He indicates he informed staff that his probation officer had previously had him sign a no harm agreement and sent him to Sound Mental Health but that he still received no help from jail staff. *Id.* Mr. Wood contends he complained of voices coming from the sink and that MHP Burns responded by telling him to buy earplugs. *Id.* He states a few days later he was

taken to the observation unit because he was concerned he would kill himself. *Id.* Mr. Wood alleges on February 19, 2018, he attempted suicide. *Id.* He also alleges MHP Merkel "destroyed" a grievance against her. *Id.*

In opposition to defendants' motion, Mr. Wood contends he has a family history of suicide and a documented history of suicidal tendencies in that he was placed on suicide watch October 10, 18, and 30, of 2017. Dkt. 89. Mr. Wood appears to argue that in light of his history defendants were deliberately indifferent to his mental health needs in failing to place him on sharps restriction or keep him on suicide watch before his alleged suicide attempt on February 19, 2019. *Id.* He also notes he was taken off sharps restriction on March 10, 2018. *Id.* [6]

"[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018), *cert. denied*, 139 S. Ct. (2019). In *Gordon*, the Court of Appeals held:

> the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated

---

[6] The Court notes that in opposing defendants' motion, plaintiff also disputes a notation from MHP Taylor's chart notes that plaintiff was offered psychotropic medication on April 7, 2017, and contends he would have taken such medication had it been offered. Dkt. 89. However, this is the first time plaintiff has raised the issue of medication. Mr. Wood's amended complaint does not mention medication or allege defendants were deliberately indifferent in failing to offer him medication. Furthermore, in light of the clinical record presented by defendants, the Court finds this conclusory statement with respect to the issue of medication is insufficient to raise a genuine issue of material fact as to whether defendants were objectively deliberately indifferent to Mr. Wood's mental health needs.

1
2

> the high degree of risk involved—making the consequences of the
> defendant's conduct obvious; and (iv) by not taking such measures,
> the defendant caused the plaintiff's injuries.

3   888 F.3d at 1125. "With respect to the third element, the defendant's conduct must be objectively

4   unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular

5   case.'" *Id.* "The mere lack of due care by a state official does not deprive an individual of life,

6   liberty, or property under the Fourteenth Amendment." *Id.* (internal quotation and citation

7   omitted). Thus, the plaintiff must "prove more than negligence but less than subjective intent—

8   something akin to reckless disregard." *Id.* (internal quotation and citation omitted).

9        The Court notes that Mr. Wood's amended complaint makes some general allegations

10   against jail staff generally with respect to his mental health treatment and mentions various

11   MHPs. Dkt. 8. However, Mr. Wood's amended complaint only specifically names MHPs Merkel

12   and Taylor, two of the MHPs at Snohomish County Jail, as defendants with respect to his

13   allegations of deliberate indifference to his mental health needs. *Id.*

14        Mr. Wood fails to establish a violation of his Fourteenth Amendment right with respect

15   his mental health care. The record here shows that Mr. Wood complained of mental health

16   symptoms somewhat sporadically and at times subsequently denied or undermined his

17   experience of those symptoms after the fact. The record shows several of the jail MHPs,

18   including MHP Taylor, concluded, based on their clinical assessments of Mr. Wood's mental

19   health, that he was likely "feigning" or exaggerating symptoms of mental illness. Dkt. 79, Taylor

20   Decl., at 3-4. The record also shows that on October 23, 2017, the Snohomish County Superior

21   Court ordered Mr. Wood to undergo psychological testing and a competency evaluation during

22   which the evaluator reviewed and summarized all of Mr. Wood's mental health records and

23   contacts with Jail MHPs during his incarceration as well as Mr. Wood's background and

1   conducted psychological testing. The report ultimately concluded, similarly to several of the jail

2   MHPs – that Mr. Wood's test results were "highly suggestive" that he was feigning or

3   exaggerating his reported psychiatric symptoms. MHP Merkel and MHP Taylor were aware of

4   the results of this evaluation as well as similar assessments of other MHPs. Dkt. 79, Taylor

5   Decl., at 3-4; Dkt. 77, Merkel Decl., at 3. The record shows jail MHPs generally continued to

6   regularly see and evaluate Mr. Wood's mental health, placing him on suicide watch when he

7   indicated to them that he was having thoughts of self-harm or he did not believe he could keep

8   himself safe.

9       Mr. Wood's generalized assertion that because he had been on suicide watch previously,

10  in October 2017, defendants should have anticipated that he would engage in self-harm several

11  months later (in February 2018) and either kept him on suicide watch or implemented a sharps

12  restriction, is entirely speculative. This is particularly so in light of Mr. Wood's documented

13  clinical history of complaining of acute mental health symptoms and subsequently denying or

14  downplaying such symptoms and the mental competency evaluation indicating he was likely

15  feigning or exaggerating his acute mental health symptoms.[7] The fact that Mr. Wood engaged in

16  acts of self-harm several months later, in February 2018, does not show objective deliberate

17  indifference on the part of the defendants or other MHPs in failing to keep him on suicide watch

18  or implement a sharps restriction. The record shows Mr. Wood was placed on suicide watch in

19  October 2017 by MHPs because he indicated he did not believe he could keep himself safe. He

20  was only removed from suicide watch in October after clinical mental health assessments by

21  MHPs and Mr. Wood's own self-assessment that he could keep himself safe. Mr. Wood's

22  generalized conclusory assertions are insufficient to raise a genuine issue of material fact to

23

---

[7] The Court notes that the chart notes submitted by defendants show the cuts on Mr. Wood's
wrists were superficial and already beginning to clot when he was examined by the jail nurse.

REPORT AND RECOMMENDATION - 39

1    preclude summary judgment.

2         Mr. Wood makes a few somewhat more specific allegations against MHP Merkel in his

3    amended complaint. The record shows that MHP Merkel had relatively few interactions with Mr.

4    Wood but Mr. Wood asserts that on one occasion in September 2017, he complained to her about

5    hearing voices and she responded by laughing and telling him he "wasn't crazy." Dkt. 8, at 8.

6    Mr. Wood claims generally that this caused him additional anxiety. *Id.* MHP Merkel denies

7    making such a statement indicating that Mr. Wood did call out to her on one occasion but she

8    declined to engage with him because she was evaluating another inmate and did not have time to

9    do so. Dkt. 77, Merkel Decl., at 2. However, even if MHP Merkel had made such a statement,

10    Mr. Wood fails to identify any facts or evidence indicating that this single statement, while

11    inappropriate if it was made, put him at substantial risk of suffering serious harm of which a

12    reasonable person would have known, or caused him injury. Rather, the record shows Mr. Wood

13    continued to be checked on and evaluated by the jails MHPs after this alleged incident.

14         Mr. Wood also alleges MHP Merkel "destroyed" a grievance he had filed against her.

15    MHP Merkel denies this. The only factual support Mr. Wood offers for this allegation is that he

16    submitted the grievance to MHP Merkel and he was told it is not in the system. Mr. Wood's

17    assertion that because the grievance is not in the system that MHP Merkel destroyed it is

18    speculative. Furthermore, even if Mr. Wood did submit a grievance that went missing, he fails to

19    explain how this put him at substantial risk of suffering serious harm of which a reasonable

20    person would have known, or caused him injury. Mr. Wood's vague and speculative allegation

21    against MHP Merkel is insufficient to raise a genuine issue of material fact to preclude summary

22    judgment.

23         MHP Merkel also acknowledges responding to a December 29, 2017, kite from Mr.

REPORT AND RECOMMENDATION - 40

1    Wood in which he complained of auditory hallucinations. MHP Merkel explains that,

2           "[g]iven what I knew from my colleagues, and from the results of
             the competency evaluation, I responded to Mr. Woods' kite by
3           indicating, "We've already done this, Mr. Wood." Because Mr.
             Wood had admitted to not experiencing auditory hallucinations and
4           to simply fabricating mental health symptoms to garner attention
             or in an effort to manipulate his housing assignment, and because
5           the results of the psychological testing done as part of the
             competency evaluation were highly suggestive of malingering, it
6           was my clinical opinion that Mr. Wood was not experiencing the
             acute mental health opinions he was reporting. If I had perceived
7           any substantial risk of serious harm to Mr. Wood indicated by his
             kite, I would have responded very differently."

8    Dkt. 77, Merkel Decl., at 3. Mr. Wood fails to raise a question of fact as to whether this single

9    response to his kite put him at substantial risk of suffering serious harm of which a reasonable

10   person would have known, or caused him injury. While Mr. Wood did engage in acts of self-

11   harm several months later in February 2018, the record shows Mr. Wood was also seen and his

12   mental health evaluated by other MHPs on several occasions in the intervening months.

13          Specifically, MHP Hoover saw Mr. Wood on January 17, 2018, and noted he was

14   cooperative, subdued and did not present as hostile, delusional or responsive to "IS" or

15   hallucinations. Dkt. 76, Hoover Decl., at Exh. D. MHP Hoover noted Mr. Wood did present as

16   mildly dysphoric and dissociative and was silently mouthing words to himself. *Id.* MHP Hoover

17   noted Mr. Wood reported ongoing auditory hallucinations with onset before booking but Mr.

18   Wood indicated that he had no community based treatment but that he attributed his current

19   housing to exacerbating his symptoms. *Id.* MHP Hoover saw Mr. Wood again on January 24,

20   2018, and Mr. Wood endorsed auditory hallucinations, but was also able to report directly

21   regarding his current mental health status, and MHP Hoover concluded that he was not a safety

22   risk to himself. *Id.*, at 4.

23          Accordingly, the Court concludes Mr. Woods fails to raise a genuine issue of material

fact as to whether defendants acted with deliberate indifference to his mental health needs and defendants are entitled to summary judgment.

## CONCLUSION

The Court recommends that defendants' motion for summary judgment (Dkt. 71) be **GRANTED**. The Court recommends that Mr. Wood's claims related to his alleged inability to make phone calls to his defense attorney from February 2018 to July 2018 be **dismissed without prejudice** pursuant to *Younger v. Harris*, 401 U.S. 37, 45, 46 (1971). The Court recommends that the remainder of Mr. Wood's claims be **dismissed with prejudice.**

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **July 29, 2019**. The Clerk should note the matter for **August 2, 2019**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses **shall not exceed ten (10) pages**. The failure to timely object may affect the right to appeal.

DATED this 12th day of July, 2019.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge